IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE MOORE, individually and on behalf of others similarly situated,<br>    Plaintiff,<br><br>  v.<br><br>AMERICAN SERVICE INSURANCE AGENCY LLC and BENEFYTT TECHNOLOGIES, INC.,<br>    Defendants. | Case No. 1:20-cv-06206<br><br><br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

1. Defendant American Service Insurance Agency LLC ("ASIA") called Plaintiff dozens of times in attempts to sell him insurance and health-related goods and services.

2. Most of ASIA's calls were made after Plaintiff had requested not to receive telemarketing, and all of ASIA's calls were made while Plaintiff's number was on the National Do Not Call Registry.

3. ASIA's calls were made in attempts to sell Benefytt Technologies, Inc. ("Benefytt") products and services.

4. Plaintiff seeks money damages and injunctive relief for himself and a class of other similarly situated persons, pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

### INTRODUCTION

5. Advancements in telephone dialing technology by the 1980s and 90s made reaching a large number of consumers by telephone easier and more cost-effective. However, this technology has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and

money. As a result, the federal government and numerous states have enacted legislation to combat these widespread telecommunications abuses. As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes…. Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

6. As is relevant here, the TCPA provides that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2).

7. The TCPA further prohibits "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity[.]" 47 C.F.R. § 64.1200(d).

8. The FCC—which develops the rules and regulations implementing the TCPA—has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, 10 FCC Rcd. 12391, at ¶ 13 (1995).

9. The FCC has "repeatedly acknowledged the existence of vicarious liability under the TCPA." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014) (citing *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574 (2013) ("*FCC 2013 Ruling*")). In addition to formal agency, principles of

apparent authority and ratification may also provide a basis for vicarious seller liability for TCPA violations. *FCC 2013 Ruling*, 28 FCC Rcd. at 6584 ¶ 28.

10. The TCPA provides for injunctive relief and the greater of actual damages or up to $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(c)(5).

11. Defendant caused multiple telemarketing calls to be made to the phones of Plaintiff and others without their prior express invitation or permission, despite such person's prior request to not be called and/or registration with the National Do Not Call Registry. Plaintiff files this class action complaint on behalf of himself and others similarly situated, seeking relief from Defendants' illegal calling practices.

## PARTIES

12. Plaintiff George Moore is a natural person who resides in DuPage County, Illinois, and is a citizen of Illinois. He was in this District when he received the calls alleged herein.

13. Defendant American Service Insurance Agency LLC is a Texas limited liability company with a principal place of business at 15438 North Florida Avenue, Suite 201, Tampa, Florida 33613. ASIA is a citizen of Texas and Florida. ASIA has been a wholly-owned subsidiary of Defendant Benefytt since approximately August 2014.

14. Defendant Benefytt Technologies, Inc. f/k/a Health Insurance Innovations, Inc. is a Delaware corporation with a principal place of business at 3450 Buschwood Park Drive, Suite 201, Tampa, Florida 33618. Benefytt is a citizen of Delaware and Florida.

## JURISDICTION AND VENUE

15. This Court has federal question subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's TCPA claims. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (2012).

16. The Court also has Class Action Fairness Act jurisdiction, because there are thousands of members of each class, at least one class member is a citizen of a different state from where any Defendant is a citizen, and because the aggregate damages exceed $5,000,000, exclusive of fees, costs and interest.

17. The Court has personal jurisdiction over Defendants and venue is appropriate in this District under 28 U.S.C. § 1391(a) because Defendants do business in this District, Defendants made or caused to be made the calls that are the subject of this lawsuit to Plaintiff and others in this District, knowingly solicited and sold insurance and other products and services to Plaintiff and other Illinois consumers during the calls at issue, and because a substantial portion of the events giving rise to this cause of action occurred in this District.

**FACTS**

18. ASIA has called Plaintiff's residential landline phone number 630-xxx-1188, dozens of times in the four years leading to the filing of this complaint.

19. The purpose of ASIA's calls to 630-xxx-1188 was to sell Benefytt's products and services, among others'.

20. Plaintiff's residential landline number, 630-xxx-1188 has been on the National Do Not Call Registry since approximately July 6, 2003.

21. Plaintiff repeatedly asked Benefytt to place his 630-xxx-1188 number on its Do Not Call list, including by email sent to support@hiiquote.com, on May 20, 2018.

22. ASIA called 630-xxx-1188 dozens of times to solicit business for Benefytt, despite Plaintiff's efforts to prevent such.

23. For instance, ASIA called 630-xxx-1188, Plaintiff's residential landline number, to solicit business for Benefytt from caller ID (334) 619-5367, as follows:

   a. One call on October 15, 2018;

   b. Three calls on October 16, 2018;

   c. Five calls on October 17, 2018

   d. Four calls on October 18, 2018;

   e. Twelve calls on October 19, 2018; and

   f. Three calls on October 22, 2018.

24. Plaintiff believes that Defendants made or caused to be made additional unsolicited telemarketing calls, as well, for which they are likewise liable.

25. Upon answering ASIA's third call on October 17, 2018, made at approximately 4:49 p.m., Plaintiff was connected to a sales agent who identified herself as "Don from Health Advisor," who attempted to sell Plaintiff health insurance and related products and services.

26. On information and belief, "Health Advisor" as referenced in the call Plaintiff received is a fictitious name. These calls are intentionally designed to withhold identifying information for the caller and seller unless and until it is determined that the recipient is interested—thereby minimizing the risk that Defendants will be identified for complaints and lawsuits about the unwanted calling at issue.

27. After answering preliminary questions asked by Don, Plaintiff was transferred to another sales agent who identified himself as "Kevin," a "verification manager."

28. After answering Kevin's additional questions, Plaintiff was transferred to another representative, Rebecca Sanchez, who identified herself as a "licensed agent" and continued to attempt to sell Plaintiff insurance and health-related products and services.

29. Don, Kevin, and Ms. Sanchez are employed by Defendant ASIA, and served in that capacity during this October 17, 2018 call to Plaintiff. For example, Ms. Sanchez is a licensed insurance agent with the state of Texas, and her license information with the Texas Department of Insurance matches ASIA's office address in Texas.

30. During the call, Ms. Sanchez attempted to sell Plaintiff a 12-month "LifeShield medical policy" PPO plan for a premium of $208.35/month (plus a $125 one-time enrollment fee), which was bundled with additional products and services.

31. Ms. Sanchez obtained the product and pricing information she provided to Plaintiff directly from Benefytt during the call, through its online platform.

32. Benefytt knew that Ms. Sanchez had obtained Plaintiff as a potential customer through improper telemarketing, but provided the quote information, anyway, in an attempt to make money through the illegal call.

33. During the call, Ms. Sanchez also provided Plaintiff with callback number 855-787-8595, extension 5105. 855-787-8595 is an ASIA number.

34. While on the phone, Ms. Sanchez had Benefytt email Plaintiff the application materials attached as <u>Exhibit A</u>, through Benefytt's MyBenefitsKeeper platform.

35. Ms. Sanchez took credit card information from Plaintiff for payment for a bundle of health insurance products and services, and entered the credit card information into Benefytt's system. Benefytt accepted Plaintiff's payment information, even though it knew Ms. Sanchez had obtained Plaintiff's business through illegal telemarketing.

36. After Plaintiff received Benefytt's email while on the call, Ms. Sanchez asked Plaintiff to confirm whether the email said "Health Insurance Innovations," which is the name

under which Benefytt was doing business at the time of the call.[1]

37. When Plaintiff responded that the email said "MyBenefitsKeeper," Ms. Sanchez confirmed that the email had come from Benefytt.[2]

38. The application materials Benefytt emailed Plaintiff were pre-filled in with the pseudonym "Randal Simpson" that Plaintiff had provided earlier in the call, and were pre-signed by Ms. Sanchez as a "Company Appointed Agent." *E.g.,* Exhibit A at pp. 2-3, 5.

39. Plaintiff has never given the pseudonym "Randal Simpson" to anyone for any purpose, other than during the October 17, 2020, call from ASIA and Benefytt.

40. When a call recipient like Plaintiff buys a product or service solicited during one of these calls, ASIA and Benefytt each takes some of the fee, even though they know the business was generated through illegal telemarketing. Additionally or alternatively, each Defendant is entitled to future monies as a result of the sale.

41. On October 17, 2018, after the call with ASIA, Plaintiff contacted Benefytt and informed it – again – that he did not want to be contacted by phone.

42. Benefytt then sent Plaintiff an email confirmation saying that Plaintiff "will no longer receive phone calls." This confirmation email Plaintiff received from Benefytt also copied Precilla Laskowski, an employee of ASIA, using Ms. Laskowski's Benefytt-owned @hiiquote.com email address.

43. Remarkably, in spite of that communication, ASIA made several more telemarketing calls to 630-xxx-1188, asking for "Randal Simpson," including:

---

[1] Health Insurance Innovations, Inc. changed its name to Benefytt Technologies, Inc. in approximately March 2020. *See* https://benefytt.com/news/hiiq-name-change-to-benefytt-technologies.
[2] *See also, e.g.,* Benefytt SEC Form 10-K (Mar. 4, 2020) (available at https://www.sec.gov/Archives/edgar/data/1561387/000156138720000002/hiiq-2019x12x31x10k.htm) (explaining that MyBenefitsKeeper "allow[s] members to manage benefits and purchase products via our online member portal").

  a. August 13, 2019, from caller ID 630-227-1602;

  b. October 1, 2019, from caller ID 904-844-0481; and

  c. November 19, 2019 from caller ID 904-844-0481.

44. The sales agents for the first of these three later calls similarly identified themselves using the fictitious name "Health Advisors" and attempted to sell Plaintiff insurance, while further confirming their relation to the prior calls by referring to Plaintiff, unprompted, using the Simpson pseudonym he had previously provided.

45. The calls alleged herein made by or on behalf of Defendants, including those to Plaintiff, were made to residential phone numbers that had been registered with the National Do Not Call Registry for more than 31 days prior to receipt of the calls.

46. Defendants did not have written do-not-call policies or procedures at the time of the calls to Plaintiff and the classes defined below. Alternatively, whatever written policies Defendants had either failed to comply with the minimum requirements under the TCPA, 47 C.F.R. § 64.1200(d), or were never properly implemented—including as evidenced by the continued calls to Plaintiff after he directly asked not to be contacted.

47. Benefytt directly participated in the calling at issue, including by providing the applicable product and pricing information to ASIA to offer during calls, and likewise emailing application materials to call recipients during the calls, themselves.

48. Benefytt maintained the power and right of interim control over ASIA's actions with respect to the telemarketing complained of herein. ASIA is Benefytt's wholly-owned subsidiary, and on information and belief, Benefytt had control over, for example, ASIA call center employee hiring, retention, and training, how ASIA sourced its leads, the geographic areas to target with calls, the times for calling, the scripts used during such calls (which Benefytt itself

provided), and whether the lead generation would occur through telemarketing or not (and the mechanics of it, such as whether the calls could be autodialed or not). Additionally, Benefytt agreed as part of a regulatory settlement with forty-three attorneys general that it would control, monitor, record, and audit all of its telemarketers' calls and actions. While Benefytt did not comply with all of its obligations under the settlement, the settlement demonstrates that Benefytt had the ability and duty to comply with the settlement's requirements, and the settlement placed Benefytt on notice of its telemarketers' bad actions.

49. Benefytt also gave ASIA access to its database platform and portal for purposes of obtaining proprietary product and pricing information for its partners (and coordinated with ASIA to provide application materials to call recipients while the consumer was still on the line), approved the use of Benefytt's tradenames like MyBenefitsKeeper and Health Insurance Innovations by ASIA during the calling at issue and subsequent emails like in Exhibit A, and approved the sale of its administrative services during each individual call—all of which Benefytt exercised via communications with ASIA on a daily basis.

50. Plaintiff and other class members reasonably believed ASIA had Benefytt's authority for the calls at issue, based on Benefytt's own actions—including through it directly permitting the use of its tradenames during such calls and in emails, compensating ASIA for business derived from such calls, permitting ASIA to access its online system to obtain detailed, proprietary pricing and product information of Benefytt clients for use in such calls, through its direct participation during the calls at issue in providing ASIA product and pricing information and emailing call recipients application materials (e.g., Exhibit A), and by retaining revenue and providing the administrative functions provided for as part of the plan the consumer purchased during such calling.

51. Benefytt knew that ASIA and other telemarketers within its network were telemarketing on its behalf without honoring consumer do-not-call requests, without having instituted proper procedures to stop calls to consumers who ask not to be contacted, and irrespective of National Do Not Call Registry status in violation of the TCPA, yet it did nothing to prevent or stop the calling at issue. Rather, instead of repudiating the calls and business derived therefrom, Benefytt knowingly continued to enjoy the benefits of the marketing, including sending quotes and application materials to new recipients like Plaintiff, receiving applications, and obtaining money through plans being purchased as a result.

52. Benefytt had been sued for similar TCPA violations prior to the calls to Plaintiff, about which ASIA was aware, but Defendants continued to engage in the conduct complained of herein despite having been put on notice of the violations.

53. Both ASIA and Benefytt's actions and omissions with regard to the telemarketing complained of herein justify a reasonable assumption that they consented to the telemarketing at issue.

54. ASIA and Benefytt each knowingly accepted benefits that originated through the nonconsensual telemarketing at issue. Benefytt knowingly compensated ASIA for such, and Benefytt accepted the advertising benefit in having its products and services solicited to Plaintiff and other class members, and further benefitted by retaining money paid by call recipients for the plans purchased as a result of the illegal calling at issue on an ongoing basis, thereby ratifying such.

55. Alternatively, to the extent that any Defendant claims it lacked full knowledge about every aspect of ASIA's telemarketing-based lead generation, it failed to investigate further despite knowledge that would have caused a reasonable person to do so.

56. Both Defendants have long known that consumers are suffering TCPA violations as a result of their improper telemarketing and lead generation practices. For example, Benefytt was previously sued under the TCPA in *Fitzhenry v. Health Insurance Innovations, Inc.*, No. 2017CV1010600389 (Charleston Cnty. Cir. Ct., S.C. filed May 9, 2017), based on telemarketing conducted through Benefytt's platform, yet continued to willfully engage in nonconsensual telemarketing to Plaintiff and others thereafter.[3] ASIA was sued for TCPA violations on March 27, 2019, at *Cunningham v. American Service Insurance Company, LLC et al.*, No. 4:19-cv-00237-ALM-CAN (E.D. Tex.).

57. Benefytt, itself, has also long publicly acknowledged the exposure it and its partners face as a result of these calls, but Defendants persist in engaging in this unlawful telemarketing, anyways.[4] *See, e.g.*, Benefytt Form 10-K (Mar. 2, 2017) ("[W]e are subject to various federal and state telemarketing regulations, including the [TCPA] and the FCC's implementing regulations, as well as various state telemarketing laws and regulations. We, our distributors, and our carriers have been, and may continue to be, the subject of allegations of TCPA violations, and we could be responsible for some of the costs incurred by distributors or carriers who are the subject of allegations of TCPA violations. Any violation of these regulations could expose us to damages for monetary loss, statutory damages, fines, penalties and/or regulatory inquiries.")

(www.sec.gov/Archives/edgar/data/1561387/000149315217002078/form10-k.htm).

---

[3] Benefytt was also sued for similar TCPA violations previously in, for example, *Moser v. Health Insurance Innovations, Inc.*, No. 3:17-cv-01127 (S.D. Cal. filed June 5, 2017), for which a nationwide class was later certified, 2019 WL 3719889 (S.D. Cal. Aug. 7, 2019).

[4] *See also, e.g.,* https://www.sec.gov/Archives/edgar/data/1561387/000149315218017413/ex10-1.htm (December 2018 regulatory settlement with Benefytt culminating from a multi-state investigation into the marketing practices of Benefytt and its third-party telemarketers, requiring recording of sales calls and compliance plan providing for "the monitoring and improvement of the sales practices of those parties marketing and/or selling Insurance Products").

58. Defendants' violations were negligent. Alternatively, they were willful and knowing.

59. Plaintiff and the classes have been damaged by these calls. Their privacy was improperly invaded, Defendants' calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. Defendants' calls were annoying and a nuisance, and wasted the time of Plaintiff and the classes. *See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (2012). Indeed, calls persisted even after Defendants were placed on notice that calls were unwanted, both directly through demands that calls cease, and through the Federal Trade Commission's Do Not Call Registry.

## CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3), on behalf of the following classes:

> **National DNC Class:** All non-customers[5] of Defendants within the United States to whom Defendants or someone on their behalf initiated more than one call for the purpose of encouraging the purchase of insurance or any health-related product or service within any 12-month period, despite the residential phone number having been registered on the National Do Not Call Registry for more than 31 days, where Defendants lack any signed, written agreement with the consumer stating that he or she agrees to be contacted by them at the phone number.
>
> **Internal DNC Class:** All persons within the United States to whom Defendants or someone on their behalf initiated more than one call for the purpose of encouraging the purchase of goods or services within any 12-month period, where at least one call came after a request to stop calling.

61. Upon information and belief, there have been thousands of non-customers in each class whose residential phone number Defendants or someone on their behalf repeatedly called to solicit insurance or health-related products or services, despite their number having been

---

[5] The limitation on "non-customers" refers to the persons' status at the time of the call. The class includes people who were not customers at the time of calls, and subsequently became customers.

registered with the National Do Not Call Registry or a prior do-not-call request.

62. Common questions of law or fact exist as to all members of the classes, which predominate over any questions solely affecting any individual member, including Plaintiff. Such questions common to the class include but are not limited to:

    a. Whether Defendants had "prior express invitation or permission" under the TCPA to call the phone numbers of Plaintiff and the National DNC Class;

    b. Whether Defendants had properly implemented do-not-call procedures meeting the minimum standards required under 47 C.F.R. § 64.1200(d);

    c. Whether Defendants had established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the TCPA's do-not-call regulations; and

    d. Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other members of the class are entitled to treble damages under 47 U.S.C. § 227(c)(5).

63. Plaintiff's claims are typical of the claims of the other members of the classes. The factual and legal bases of Defendants' liability to Plaintiff and the other members of the class are the same: They violated the TCPA by causing multiple unsolicited telephone solicitations to be made to the telephone number of each member of the National DNC Class despite their number's registration with the National Do Not Call Registry and, as to the Internal DNC Class, despite having failed to institute necessary procedures and calling despite a prior request to not be called.

64. Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff has no interests that might conflict with the interests of the classes. Plaintiff is interested in

pursuing his claims vigorously, and he has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

65. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual action would entail. There are, on information and belief, thousands of members of each class, such that joinder of all members is impracticable.

66. No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

67. Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the classes, thereby making relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual members of the classes, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct.

68. The identity of the classes is, on information and belief, readily identifiable from Defendants' records.

## COUNT I
### Violations of the Do Not Call Registry provisions of the TCPA, 47 U.S.C. § 227
### (On Behalf of Plaintiff and the National DNC Class)

69. Plaintiff re-alleges and incorporates all prior paragraphs. This Count I is brought by Plaintiff on behalf of himself and the National DNC Class.

70. It is a violation of the TCPA to initiate any telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the National Do Not Call Registry. 47 C.F.R. 64.1200(c)(2).

71. Defendants violated the TCPA by initiating or causing to be initiated multiple telephone solicitations to Plaintiff and the other members of the National DNC Class in a 12-month period, despite the person's registration of his or her telephone numbers on the National Do Not Call Registry.

72. These violations were willful or knowing.

73. As a result of Defendants' violations of the TCPA's national do-not-call rule, Plaintiff and the other members of the National DNC Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

74. Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

75. To the extent a Defendant did not physically "initiate" the calling at issue itself, it is nonetheless vicariously liable based on theories of actual authority, apparent authority, and ratification, for these calls were made on its behalf.

WHEREFORE, Plaintiff George Moore, individually and on behalf of the National DNC Class, respectfully requests that the Court enter judgment against Defendants for:

  A. Certification of the National DNC Class as alleged herein;

  B. Damages, pursuant to 47 U.S.C. § 227(c)(5);

  C. Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at preventing Defendants from violating the TCPA in the future, including:

    1. Requiring Defendants to establish and implement do-not-call

policies;

2. Requiring Defendants to hire a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of Defendants' telemarketing calls to ensure that Defendants had consent and that the consumer had not previously asked that calls stop, and (c) report the results of the above investigations to the Court and Plaintiff's counsel on a quarterly basis; and

3. Requiring Defendants to include an automated IVR opt-out mechanism at the beginning of any and all prerecorded-voice calls, for which opt-outs are actually honored;

D. Attorneys' fees and costs, as permitted by law; and

E. Such other or further relief as the Court deems just and proper.

## COUNT II
### Violations of the <u>Internal Do Not Call</u> provisions of the TCPA, 47 U.S.C. § 227
### (On Behalf of Plaintiff and the Internal DNC Class)

76. Plaintiff re-alleges and incorporates Paragraphs 1-68 above as if fully set forth herein. This Count II is brought by Plaintiff on behalf of himself and the Internal DNC Class.

77. It is a violation of the TCPA to "initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d). The procedures instituted must meet certain minimum standards, including but not limited to: (1) having a written policy, available on demand, for maintaining a do-not-call list; (2) informing and training personnel engaged in any

aspect of telemarketing on the existence and use of the do-not-call list; (3) recording and honoring do-not-call requests; (4) identifying the caller and person or entity on whose behalf the telemarketing call is being made; (5) applying the do-not-call request to the particular business entity making the call or on whose behalf the call is made; and (6) maintaining a record of a request not to receive further telemarketing calls and honoring such for at least five years from the time the request is made. *Id.*

78. It is a violation of the TCPA to accept business derived from telemarketing initiated by an entity that does not have a written Do Not Call policy, or that does not adhere to a policy that exists that would otherwise meet the above minimum standards. Defendants did this.

79. Defendants caused to be initiated multiple telemarketing calls to the phone numbers of Plaintiffs and the other members of the Internal DNC Class in violation of these regulations in a 12-month period. The reason for the noncompliant calls is that Defendants failed to institute a telemarketing policy that complied with 47 C.F.R. § 64.1200(d), and the entity or entities that "initiated" such calls on their behalf (e.g., ASIA), on information and belief, had no written policy at all. Alternatively and additionally, Defendants or those who called on their behalf unreasonably and willfully failed to adhere to any policies that might have complied with the letter of 47 C.F.R. § 64.1200(d), thus causing the violative calls.

80. The calls at issue also failed to identify the caller at the outset of the call and failed to identify a phone number or address where the consumer may opt out of future calls. 47 C.F.R. § 64.1200(d)(4). This was by design: Benefytt did not require its telemarketers like ASIA to state this information at the beginning of phone calls (if at all), so that they could continue to accept business from the calls, with impunity. Indeed, Plaintiff himself was forced to go through the entire call process (including multiple in-call transfers) in order to find out just who was

behind it.

81. Defendants also violated the TCPA by failing to adhere to their own policies concerning the Internal Do Not Call rules (to the extent they existed at all). On information and belief, Defendants each also failed to properly inform and train their respective personnel, including Benefytt's telemarketers like ASIA, in the existence and use of a do-not-call list—as evidenced by the fact that Plaintiff continued to be called after indicating that he they did not want to be contacted. Benefytt did not share Plaintiff's do-not-call request with its telemarketer.

82. These violations were willful or knowing.

83. As a result of Defendants' violations of the TCPA's internal do-not-call rules, Plaintiff and the other members of the Internal DNC Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

84. Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

85. To the extent a Defendant did not physically "initiate" the calling at issue itself, it is nonetheless vicariously liable based on theories of actual authority, apparent authority, and ratification, for these calls were made on its behalf.

WHEREFORE, Plaintiff George Moore, individually and on behalf of the Internal DNC Class, respectfully requests that the Court enter judgment against Defendants for:

    A. Certification of the Internal DNC Class as alleged herein;

    B. Damages, pursuant to 47 U.S.C. § 227(c)(5);

    C. Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at preventing Defendants from violating the TCPA in the future, including:

        1. Requiring Defendants to establish and implement do-not-call

policies;

2. Requiring Defendants to hire a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of Defendants' telemarketing calls to ensure that they are identified during the beginning of each call; and

3. Requiring Defendants to include an automated IVR opt-out mechanism at the beginning of any and all prerecorded-voice calls, for which opt-outs are actually honored;

D. Attorneys' fees and costs, as permitted by law; and

F. Such other or further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: October 19, 2020

GEORGE MOORE, individually and on behalf of others similarly situated

By: _/s/ Alexander H. Burke_

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*

**Document Preservation Demand**

      Plaintiff hereby demands that Defendants take affirmative steps to preserve all recordings, data, databases, call records, consent to receive autodialed or artificial or prerecorded voice calls, e-mails, recordings, documents, and all other tangible things that relate to the allegations herein, Plaintiff, or the putative class members, or the making of telephone calls, the events described herein, any third party associated with any telephone call, campaign, account, sale, or file associated with Plaintiffs or the putative class members, and any account or number or symbol relating to any of them. These materials are very likely relevant to the litigation of this claim. If Defendants are aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendants request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of Defendants.

                                                                                                                */s/ Alexander H. Burke*